**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

CHARLES McALLISTER, also known as
Charles McCallister,

                            Plaintiff,

        v.                                                                    No. 10-CV-610
                                                  (FJS/DRH)

BRIAN FISCHER, Commissioner of New York
State Department of Correctional Services;
LUCIEN J. LeCLAIRE, Deputy Commissioner,
New York State Department of Correctional
Services; PATRICIA LeCONEY, Superintendent,
Cape Vincent Correctional Facility; CAROL
WOUGHTER, Superintendent, Mohawk
Correctional Facility; and JOHN/JANE DOE(S),

                          Defendants.

_____

**APPEARANCES:**                                    **OF COUNSEL:**

CHARLES McALLISTER
Plaintiff Pro Se
279 Siegel Street
Westbury, New York 11590

HON. ERIC T. SCHNEIDERMAN                  ADELE M. TAYLOR-SCOTT, ESQ.
New York State Attorney General              Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER
U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

    Plaintiff pro se Charles McAllister ("McAllister"), formerly an inmate in the custody of the

New York State Department of Correctional and Community Services ("DOCCS"), brings

_____

    [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

this action pursuant to 42 U.S.C. § 1983 alleging that defendants, a Commissioner, Deputy

Commissioner, two Superintendents, and others unidentified, violated his constitutional

rights under the First and Fourteenth Amendments.  Compl. (Dkt. No. 1).  Presently pending

is defendants' motion for summary judgment, pursuant to Fed. R. Civ. P. 56.  Dkt No. 49.

McAllister opposes the motion.  Dkt. No. 53.   For the following reasons it is recommended

that defendants' motion be granted in part and denied in part.


## I.  Background

The facts are related herein in the light most favorable to McAllister as the non-moving

party on defendants' motion for summary judgment.  <u>See</u> subsection II(A) <u>infra</u>.


## A.  DOCCS Directive #4913

On October 23, 2008, defendant Commissioner Fischer issued a memorandum

regarding inmate property entitled "Directive # 4913."  Dkt. No. 49-2 at 5-11.  The directive

explained that

> The accumulation of excessive inmate personal property has a
> significant and wide ranging impact on the operation of the entire
> agency . . . includ[ing], but . . . not limited to:
>
> - The time consuming and labor intensive process of packing,
>   searching and storing.
> - Fire and safety hazards within inmate living quarters related
>   to the accumulation of excessive "fire load" items.
> - Sanitation and hygiene issues associated with the long-term
>   storage of unused food items, clothing and paper.
> - Increased risk of loss, theft and pilferage, and the resulting
>   lost property claims and potential violence.
> - Escalating cost of statewide storage areas.

2

Dkt. No. 49-2 at 5.  Property restrictions were "not new to th[e] agency," and already "exist[ed] in [varous other] programs . . . ."  Dkt. No. 49-2 at 5.

DOCCS determined "that a reasonable threshold for the amount of inmate personal property that could be efficiently processed and moved from one facility to another would be that amount that could fit into four (4) standard fabric 'draft bags' . . . ."  Id.  The policy included an incremental, phase-in portion, specifically affecting general population inmates who had been incarcerated in or before 2008.  Id. at 5, 11 (quick reference chart).  Special Housing Unit (SHU)[2] inmates who were serving a disciplinary disposition exceeding sixty days were immediately required to be in compliance with the directive, allowing for "four (4) draft bags of property . . . [and] documented active legal cases . . . in a fifth (5th) draft bag if necessary."  Dkt. No. 49-2 at 8.  Inmates could choose to dispose of any excess property by either (1) shipping it to a family member or friend at their own expense; (2) sending the property home with a visitor; (3) donating the property to a charitable organization; or (4) allowing DOCCS to destroy the property.  Dkt. No. 49-2 at 15, 18.  On August 1, 2009, in compliance with the above directive, McAllister made arrangements to send, at his own expense, multiple items of personal property and legal documents to various individuals.  Dkt. No. 49-2 at 21-35.

---

[2]SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b) (1995).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

**B.  Disciplinary Hearing**

On July 15, 2009, McAllister was issued a misbehavior report by third party Femia for providing unauthorized legal assistance and having materials in his possession which were exchanged without permission.  Dkt. No. 49-2 at 37.  During a search of McAllister's personal property, Femia "confiscated (20) articles of paper which appeared to be legal work that included some signed affidavits from [five named] inmates . . . ." Id. at 43; see also Id. at 44-64 (confiscated paperwork including affidavits from five other inmates).

McAllister received notice of the hearing via delivery of a copy of the misbehavior report, on July 16, 2009.  Dkt. No. 49-2 at 37, 39.  McAllister also was provided with one of his requested legal assistants, A. Sullivan.  Id. at 39, 41.  Sullivan met with McAllister on July 16, 2009.  Id. at 39.  During the interview, Sullivan recorded the names of five inmates who agreed to testify at the hearing and requested various directives and rule books on McAllister's behalf from prison authorities.  Id. at 40.

McAllister's disciplinary hearing commenced on July 21, 2009.  Dkt. No. 49-2 at 65. McAllister first objected to the misbehavior report, alleging that it provided ineffective notice.  Id. at 68.  McAllister's copy of the misbehavior report alleged the date, time, and place of the incident, but it omitted the names of the inmates whose affidavits were found in the confiscated materials, while the report that relied upon by the hearing officer listed all five names.  Id.  McAllister also contended that, as there were five inmates indicated on the misbehavior report, their identities should have been disclosed pursuant to the directive commanding a detailed account of the factual situation surrounding each inmate when multiple inmates were involved in a disciplinary infraction.  Id. at 69-71.  Despite the narration on the misbehavior report, McAllister stated that the context was unhelpful given

4

the fact that he has "volumes of things . . . [as he has] been locked up for a very long time [and] . . . in court with four different courts . . . ." Id. at 88.

Moreover, McAllister disputed the merits of the misbehavior report, first expressed in a letter to defendant Woughter (Dkt. No. 49-2 at 115-18, 130-32),[3] that the property which was confiscated was all McAllister's legal work, that he was not providing legal assistance to any other inmate, and that the other inmate affidavits were in his property because he was using them to prove his assertions in a law suit he had filed against the Division of Parole[4]. Id. at 73-80, 85. Accordingly, the legal documents were part of McAllister's own legal work, which he authored solely for his own personal use in his own personal litigation with the state. Id. at 90, 92, 95-96. McAllister further stated that "[t]here is no rule that says that [he] can[ not] have another affidavit from another inmate in [his possession to] support . . . [his pending] civil action in court." Id. at 81. As McAllister was tasked with proving his position with more than conclusory allegations, he contended that the statements were necessary to advance his case and no different than DOCCS allowing inmates to produce statements in support of their defense during their disciplinary hearings. Id. at 82-84. McAllister also contended that his supervisor at the Law Library was aware of his pending

---

[3] While McAllister's letter regarding the substance of the misbehavior report allegations was received by Woughter, it was then forwarded to third party McCarthy for ultimate review. Dkt. No. 49-2 at 128. McCarthy determined that the appropriate place to resolve these concerns was during the course of the disciplinary hearing. Id.

[4] The only documentation provided in connection with McAllister's other pending litigation was a decision dismissing the action dated April 17, 2008. Dkt. No. 49-2 at 223-26. However, in McAllister's complaint he indicates that he is pursuing an "actual innocence" defense to combat his criminal conviction and that the directive "will cause . . . criminal files to be taken from him," and placed in the custody of family, at a great expense, who do not understand the importance or implications of those documents. Compl. at 7.

litigation and the affidavits and that McAllister was not required to receive permission for these actions because the affidavits were acquired in pursuit of litigating McAllister's claims. Id. at 93.  The hearing officer adjourned the hearing to do more research before rendering his final decision and McAllister stated that he "really d[id not] need the[ witnesses identified by Sullivan] unless [Call] want[ed] to [call them]." Id. at 96.

McAllister was ultimately found guilty and sentenced to confinement in SHU for ninety days and loss of package, commissary, and phone privileges.  Dkt. No. 49-2 at 37.  In making this decision, the hearing officer relied on the misbehavior report, information from a confidential source, the documents seized from McAllister's cell, and McAllister's disciplinary history[5].  Dkt. No. 49-2 at 38, 104-05.  The confidential information was produced and examined by the hearing officer, outside of McAllister's presence.  Dkt. No. 49-2 at 42, 102-03.  McAllister was not informed of the informant's name or allowed to know what the content of the information was to which the informant testified.  Dkt. No. 49-2 at 42.

McAllister timely appealed the disciplinary determination, citing to deficiencies in the notice, the hearing officer's bias, ambiguity of the rules, failure to call witnesses, and evidence relied upon by the hearing officer, particularly the confidential witness.  Dkt. No. 49-2 at 109-12.  On August 26, 2009, McAllister's disciplinary conviction and sentence were reversed and McAllister's record was ordered expunged because the "evidence d[id] not

---

[5] On July 28, 2009, McAllister was interviewed in connection with a misbehavior report given to another inmate who was in possession and admittedly storing McAllister's legal documents for him.  Dkt. No. 49-2 at 141.  Also at that time, McAllister was advised of the property limitations outlined in Directive # 4913 and the fact that he would have to become in compliance with the directive upon his transfer.  Id.

support a guilty finding." Id. at 107; see also Id. at 108.  On August 1, 2009, McAllister also

received the confiscated legal material and affidavits back from DOCCS.  Id. at 121.

Despite the reversal, McAllister spent between forty-two and sixty days in SHU.   Compare

Dkt. No. 49-2 at 133 (indicating confinement in SHU from July 9 to July 22, 2009) with Dkt.

No. 53, ¶ 4 (noting extended date of September 9, 2009) and Defs. Statement of Material

Facts (Dkt. No. 49-1) at ¶ 11 (stating that McAllister "spent less than 60 days in SHU) ;

Defs. Mem. of Law (Dkt. No. 49-3) at 13 (indicating McAllister spent approximately 42 days

in SHU).


### C.  Grievances

On July 28, 2009, McAllister was interviewed in connection with a misbehavior report

issued to another inmate who was in possession and admittedly storing McAllister's legal

documents for him.  Dkt. No. 49-2 at 141.  Also at that time, McAllister was advised of the

property limitations contained in Directive # 4913 and that he was required to comply with

the directive.  Id.  The following day McAllister filed a grievance complaining of the

constitutionality of the directive and stating that the policy discriminated against inmates

sentenced to SHU.  Id. at 143.  McAllister also contended that the directive impeded his

access to the courts because he has "[six] pending cases in Federal, State Supreme,

Appellate Court, [and the] Court of Claims [thus] he NEED[S] his legal materials to prove his

case, to present his pleadings with evidence, documentations [sic], case law and exhibits."

Id. at 144 (emphasis in original).

On August 1, 2009, McAllister wrote to Woughter seeking an exception to Directive #

4913 to keep an additional two and a half bags of legal material.  Dkt. No. 49-2 at 135-36.

McAllister stated that he required the paperwork for the pending "[five] other litigations in

NDNY, Albany Supreme and Court of Claims." Id. at 135.  In the interim, to comply with the

directive, McAllister sent the paperwork to an attorney at Prisoner's Legal Services.  Id. at

135-36.

On August 3, 2009, McAllister filed a grievance regarding Directive # 4913.  Dkt. No.

49-2 at 142-45.  The grievance was investigated and multiple memoranda were filed.

McAllister was interviewed and

> stated that he had to send out 2 ½ bags of legal work to an
> attorney and he was challenging the new policy and wanted an
> exception . . . [Sgt. Perry] asked [McAllister] if it was explained to
> him about the 4 bag plus 1 legal bag and he could have kept more
> of his legal work in the 4 bag limit and [McAllister] stated that it was.
> [McAllister] stated that he felt that it was unfair to have to get rid of
> other personal property to keep his legal work and that is why he is
> challenging the policy.

Dkt. No. 49-2 at 137.  McAllister was also interviewed prior to his transfer to SHU at which

the property limits were again explained.  Id. at 139.  McAllister

> was allowed to go through all of his personal property to determine
> which legal materials/personal property he wanted to accompany
> him to [the] next facility.  He chose to bring 1 bag of legal materials
> with him as well as 2 bags of person property, a typewriter and bag
> #1 state issue.  He sent 1 bag of legal materials at his expense to
> Gouverneur C[orrectional] F[acility] and sent an additional 7 bags
> of legal materials/personal property to various addresses at his
> expense.  McAllister personally disposed of several bags of
> personal property on [August 1st] while deciding which items he
> wanted to accompany him to Gouverneur.

Dkt. No. 49-2 at 139.  McAllister's grievance was reviewed, investigated, and ultimately

denied based on the validity of the Directive, McAllister's understanding of such, and

McAllister's ability to select the property that he would keep and that he would send

elsewhere.  Dkt. No. 49-2 at 124-26.

On January 12, 2010, McAllister was transferred to Watertown Correctional Facility from Cape Vincent Correctional Facility, with property, for a court trip.  Dkt. No. 49-2 at 146. On January 19, 2010, McAllister was transferred from Watertown to Marcy Correctional Facility, whereupon half a bag of his property was found to be missing.  Id.  On January 22, 2010, McAllister filed a claim form seeking damages for his lost legal and personal property. Id. at 146, 151 McAllister also compiled documentation indicating the cost of replacing the missing legal work.  Id. at 167-94.  McAllister contends that the lost bag contained documents which took ten years to amass, could not be re-created, and were required for his "pending civil court of claims action."  Compl. at 7.  Specifically, McAllister lost a set of taped recordings

> by seven police officers involved in the arrest and conviction of [McAllister which] . . . w[ere] evidence in criminal proceedings which [McAllister] had to use in his 'actual innocence' application to the United States Court of Appeals.  The loss of these tapes . . . have caused irreparable harm by the loss of reasonable evidence that if reviewed would have a probably different review of the criminal trial evidence against [McAllister].

Id.

An investigation determined that a clerical error resulted in the misplacement of McAllister's property and he was offered a settlement of $300.  Dkt. No. 49-2 at 147-50, 152-65, 202-04.  It appears that McAllister declined the settlement.  Id. at 205.  This was the final settlement offer of DOCCS and the claim was to proceed in the New York State Court of Claims.  Id. at 206.

## II. Discussion

McAllister asserts nine separate causes of action as follows:

| Number | Description |
|--------|-------------|
| 1, 6 | Directive #4913 unconstitutionally deprives inmates of their First Amendment right of access to the courts on its face and as applied to McAllister |
| 2, 8 | McAllister lost property under Directive #4913 in violation of of his Fourteenth Amendment right to due process of law |
| 3 | Directive #4913 unconstitutionally deprives inmates serving long sentences of their Fourteenth Amendment right to equal protection of the law |
| 4, 5, 7 | Directive #4913 deprives McAllister of his First Amendment right of access to the courts |
| 9 | Retaliation |

Compl. at 5-7.  Defendants move for judgment contending that (1) McAllister's request for injunctive relief has been rendered moot; (2) McAllister has failed to establish the personal involvement of defendants; (3) McAllister's causes of action are meritless; (4) defendants are protected in their official capacities by the Eleventh Amendment; and (5) defendants are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted))..  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48.


### B. Injunctive Relief

To the extent that McAllister requests injunctive relief, such requests are moot as he has been released from prison.  See Hallett v. New York State Dep't of Corr., 109 F. Supp. 2d 190, 196 (S.D.N.Y. 2000) (holding that when an inmate is released from prison and no

longer "under the supervision of any of the named defendants, his requests for injunctive relief are dismissed as moot."). Accordingly, to the extent McAllister seeks injunctive relief, that claim for relief should be denied as moot.

### C. Personal Involvement

Defendants contend that DeLeon has failed to establish that the named defendants were personally involved in any of the alleged constitutional deprivations. "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

Defendants argue that McAllister has failed to demonstrate the personal involvement of any of the named defendants in the initiation or conduct which occurred in conjunction with the Tier III disciplinary hearing.  With respect to Commissioner Fischer, Deputy Commissioner LeClaire, and Superintendent LeConey, even construing the facts in the light most favorable to McAllister, it appears that any asserted involvement in the disciplinary hearing process finds its genesis in their positions as superiors in DOCCS.  However, a position in a hierarchical chain of command, absent something more, is insufficient to support a showing of personal involvement.  Wright, 21 F.3d at 501.

The only individual who was involved with the disciplinary hearing was  Woughtner, who received McAllister's letter prior to his disciplinary hearing and forwarded it to a subordinate for review and decision.  Merely writing letters to defendants is insufficient to establish notice and personal involvement.  Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . .").  Similarly, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement.  See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y.2009) (citing cases); Boddie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").  Furthermore, it is within the purview of a superior officer to delegate responsibility to others.  See Vega v. Artus, 610 F. Supp. 2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was

13

to refer the inmate's complaint to the appropriate staff for investigation.") (citing

Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F. Supp. 2d 342, 347 (W.D.N.Y.

2007)).

Accordingly, defendants' motion on this ground, with respect to the disciplinary hearing

claim, should be granted.


## D. First Amendment

### 1.  Retaliation

McAllister claims that defendants retaliated against him by transferring him to SHU,

making him pare down his property in conformance with Directive # 4913, only to have the

underlying disciplinary dispositions reversed after transferring to SHU.  Compl. at 7.  To

state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct

was constitutionally protected and that this protected conduct was a substantial factor that

caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.

1996).  "Types of circumstantial evidence that can show a causal connection between the

protected conduct and the alleged retaliation include temporal proximity, prior good

discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as

to their motives."  Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations

omitted).

> There is no bright line to define the outer limits beyond which a
> temporal relationship is too attenuated to establish a causal
> relationship, so courts judge the permissible inferences that can be
> drawn from temporal proximity in the context of particular cases.
> However, courts have found that six and eight month gaps
> between the protected conduct and adverse action were sufficient,

> while in other circumstances three months was considered too
> long.

Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration.  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008).  Therefore, conclusory allegations alone are insufficient. Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")).

In this case, McAllister has failed to proffer facts sufficient to support a retaliation claim. First, it is unclear in which constitutionally protected activity McAllister alleges he was engaged.  Second, McAllister only proffers conclusory allegations to demonstrate retaliation.  McAllister has offered no facts which would identify what the protected activity was that he was engaging in, how the activity served as a substantial factor in defendants' alleged violations of his First and Fourteenth Amendment rights, which defendants participated in the retaliation, or what each defendant did to advance the retaliation.  Such conclusory allegations, without more, are insufficient to demonstrate retaliation.  Id.

Accordingly, defendants' motion should be granted as to the ninth cause of action.


## 2. Access to Courts

"Prisoners . . .  have a constitutional right of access to the courts . . . ."  Bourden v. Loughren, 386 F.3d 88, 92 (2d Cir. 2004) (internal quotation marks omitted) (citing Bounds

v. Smith, 430 U.S. 817, 821-22 (1977) (citations omitted) (holding that all prisoners have a well-established Constitutional right to "adequate, effective, and meaningful" access to courts). This "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers . . . ." Bounds, 430 U.S. at 828. To establish a claim for denial of access to the courts, a plaintiff must prove "that a defendant caused 'actual injury,' i.e., took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'" Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (citing Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996)). The injury must have been the result of the deliberate and malicious behavior of a defendant. Tajeddini v. Gluch, 942 F. Supp. 772, 780 (D. Conn. 1996).

In this case, McAllister contends that his rights were infringed when (1) he was forced, pursuant to Directive # 4913, to send his legal papers to various individuals; (2) his legal papers and tapes were lost; and (3) liberally construing his complaint, he did not have a competent law library assistant to rely upon after sending his own personal legal resources home or to his attorney.[6] McAllister contends that defendants' actions resulted in prejudice to his legal actions. However, McAllister fails to state which legal actions were prejudiced. Conclusory generalizations are insufficient to establish an actual injury. See Lewis, 518

---

[6]Inter alia, McAllister requests to have more intelligent and capable law library assistants. This request is meritless. See Lewis v. Casey, 518 U.S. 343, 351 (1996) (explaining that there is no "abstract, freestanding right to a law library or legal assistance, [and that] an inmate cannot establish relevant . . . injury [requiring constitutional protection] simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense."). While McAllister may be frustrated by the caliber of assistance the prison provides, this is insufficient to reach the status of a constitutional violation. Accordingly, because McAllister has no legal entitlement to assistants with a certain level of education or experience, such relief should be denied.

U.S. at 351 (giving examples of actual injury including inability to assert or continue a claim); Arce v. Walker, 58 F. Supp. 2d 39, 43 (W.D.N.Y. 1999) ("[A] claim that prison practices kept a prisoner from raising an argument or asserting a claim in his pleadings, in response to a dispositive motion, or at trial would likely suffice to show harm," but claims that the prison practice prevented the inmate from "ma[king] a more compelling or sophisticated argument would not.").

McAllister contends that the papers which he sent home were essential in proving his various state and federal cases, though he fails to identify these cases or their claims, or raise a question of material fact as to the merits of such allegations against the various defendants.  Furthermore, McAllister claims the lost legal papers and tapes were essential for his "actual innocence" claim, but he fails to indicate whether that claim was already in existence or just a prospective claim that he hoped to bring in the future, or how those documents and tapes supported the viability of such claims so that McAllister's claims would support a meritorious complaint.  Accordingly, without identification of the underlying action which was prejudiced, actual injury, and by extension a First Amendment violation, cannot be established.  See Christopher v. Harbury, 536 U.S. 403, 415 (2002) ("[T]he underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation.").

Accordingly, defendants' motion should be granted on this ground as to the first, fourth, fifth, sixth, and seventh causes of action.

### E. Fourteenth Amendment

### 1. Due Process

### a. Atypical and Significant Deprivation

McAllister alleges that he was found guilty at the disciplinary hearing based on a lack of evidence.  As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life.  Id. at 484; Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation.  The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998).  The Second Circuit has noted that where the period of segregated confinement exceeds thirty days, "refined fact-finding" is required to resolve defendants' claims under Sandin.  Colon v. Howard, 215 F.3d 227, 230 (2d Cir. 2000).  While there is some dispute over the length of time McAllister was in SHU, at a minimum, he was segregated for forty-two days.  Accordingly, as that sentence exceeds thirty days, defendants' motion on this ground should be denied.

**b. Fair and Impartial Hearing**

While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  A prisoner is "entitled to advance written notice . . . ; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken."  Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

McAllister contends that he was found guilty with no evidentiary support.  McAllister consistently presented his defense that the affidavits from other inmates in his property were drafted and intended to support his own state court action.  McAllister did not write the affidavits for the other inmates' uses.  McAllister's intention was to provide the state court with evidentiary support in furtherance of his own claims.  McAllister's supervisor was aware of his actions and McAllister testified that he did not require permission to gather evidentiary support for his pending claims.  It is undisputed that such support is required in any lawsuit to establish the merits of the parties' claims.

"To comport with due process, the decision to confine [McAllister] in SHU must have been supported by 'some evidence.'"  Espinal v. Goord, 180 F. Supp. 2d 532, 539 (S.D.N.Y. 2002) (citations omitted).  "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the [hearing officer]."  Superintendent v. Hill, 472 U.S. 445, 455-56 (1985) (citations omitted).

19

McAllister's testimony, in combination with the discovery of the affidavits, does not support a finding of guilt.  In addition to the testimony elicited at the hearing and the misbehavior report, the hearing officer also relied upon confidential information.  The Second Circuit has determined "that the some evidence standard may be met even where the only evidence was supplied by a confidential informant, as long as there has been some examination of indicia relevant to the informant's credibility."  Gaston v. Coughlin, 249 F.3d 156, 163 (2d Cir. 2001) (internal quotation marks and citations omitted).  During the disciplinary hearing, McAllister was not informed of the content or source of the confidential information.  This is not necessarily required, but there must be some additional assessment performed by the hearing officer.  Id. at 163-64 (discussing appropriate credibility assessments based upon a discussion, outside the presence of the informant, of why the informant testified, the informant's motivations for testifying, and the informant's past proven reliability).  In this case, there was none.

The hearing officer advised McAllister that confidential information had been proffered, he had heard it, and he found it sufficiently compelling to support McAllister's guilt.  This is woefully insufficient to establish an independent credibility assessment.  Accordingly, reliance upon this testimony is also inappropriate to constitute some evidence in support of the disciplinary determination.

Lastly, the hearing officer relied on McAllister's disciplinary history to serve as a basis for his determination.  The only additional supporting evidence of McAllister's relevant disciplinary history involved an incident where another inmate held McAllister's legal work for him so that McAllister did not have to send it away from the facility to be in compliance with the directive.  This is clearly distinguishable from the charge at issue here, where the

other inmate property McAllister was in possession of were affidavits he generated and intended to use in furtherance of litigating his state court claims.

Thus, on this record neither McAllister's possession of the affidavits of five other inmates, his own testimony, the testimony of a confidential informant, nor McAllister's prior disciplinary record provided any evidence to support the charge that McAllister wrongfully possessed the other inmates' affidavits.  Accordingly, defendant's motion on this ground should be denied.


## 2.  Directive # 4913[7]

McAllister contends that he suffered an unconstitutional deprivation of his legal and personal property pursuant to Directive # 4913.  Inmates' rights are not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives – including deterrence of crime, rehabilitation of prisoners, and institutional security."  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted); see also Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation . . . is reasonably related to legitimate penological interests.") (citations omitted).  This deferential standard takes into consideration the difficulty and expertise required to make "the day-to-day judgments of [a] prison official[] . . . ."  Turner v. Safley, 482 U.S. 78, 89 (1987).

The Turner Court determined that the four factors to be considered

---

[7] Defendants also claim qualified immunity in their implementation and application of Directive # 4913.  Defs. Mem. of Law (Dkt. No. 49-3) at 17-19.  As McAllister's claims with regard to the directive have been deemed meritless, the defendants' arguments with respect to qualified immunity need not be addressed.

> are: 1) whether there is a rational relationship between the
> regulation and the legitimate government interests asserted; 2)
> whether the inmates have alternative means to exercise the right;
> 3) the impact that accommodation of the right will have on the
> prison system; and 4) whether ready alternatives exist which
> accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987).

While it is clear that DOCCS may not deprive inmates of all their legal work product,

restrictions on the quantity of legal materials inmates are allowed to retain have previously

been deemed reasonable.  See, e.g. Howard v. Snyder, 389 F. Supp. 2d 589, 593 (D.Del.

2005) (holding that a "'two box per inmate' regulation which permits prison officials to

confiscate excess property beyond the authorized amount . . . 'is 'reasonably related' to

legitimate penological objectives.'") (citations omitted).  In this case, DOCCS has proffered

such justifications citing fire, safety, and sanitary hazards which justified the directive.  Id. at

593-94 (finding that restriction was reasonably related because it "ensur[ed] adequate living

space . . . reduc[ed] fire and safety hazards . . . ." and reduced the number of places to hide

contraband increasing the levels of safety for both inmates and staff).  Thus, the

confiscation of excess property shares a rational connection with the safe and orderly

administration of DOCCS.  Therefore, the first Turner factor weighs in favor of defendants.

The second Turner factor also weighs in favor of the defendants.  McAllister contends

that he would rather have his own legal resources to depend upon than that of the law

clerks in the library, but the law library and the clerks remained available and accessible to

inmates to assist in their legal research and writing.  Moreover, DOCCS provided McAllister

with the opportunity to sort through his personal and legal belongings and choose which

would stay with him and which would be sent off.  DOCCS also provided multiple avenues

22

with which to dispose of the excess property depending upon the means and preferences of the inmates.

The third <u>Turner</u> factor also weighs in defendants' favor.  As previously stated, allowing inmates to have excess legal and personal property results in sanitary issues, crowded spaces, fire hazards, and safety hazards given the additional spots where contraband could be hidden.  This excess of inmate property jeopardizes the safety of both correctional officers and other inmates.  A deferential standard is accorded to prison officials in light of these aforementioned concerns and, therefore, the third factor also tips towards the ultimate conclusion of reasonableness.

The fourth <u>Turner</u> factor also weighs in defendants' favor.  As explained, there were a number of options for McAllister as he was given the opportunity to sort through his belongings and keep an additional bag of legal documents in lieu of personal property. McAllister chose to keep his personal property instead.  DOCCS also afforded an additional program allowing for special accommodations, as referenced in McAllister's August 1st letter to defendant Woughter seeking an exception to the directive.  Accordingly, DOCCS did provide ready alternatives, but none were not the alternative which McAllister sought as his proposed solution to keep all of his property was in contravention of the facility's wellness and safety.

Accordingly, Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them.  Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.  Thus, Directive #

23

4913 did not violated McAllister's Fourteenth Amendment rights and defendants' motion on this ground should be granted as to the constitutionality of the directive.

### 3.  Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons be treated equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

Vegas v. Artus, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and citations omitted).

McAllister's Equal Protection claim fails for a multitude of reasons.  First, McAllister claims his treatment was based upon his status as a litigious inmate with a protracted prison sentence.  Prisoners are not a part of a protected class.  Scott v. Denison, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) (citations omitted).  Moreover, McAllister cannot show that he was treated differently than another class of similarly situated inmates since all inmates were subjected to the same directive.  Instead, McAllister seems to be alleging the directive has a disparate impact on inmates with long prison sentences or who are overly

litigious.  However, a neutral law resulting in a disproportionate impact, without a discriminatory purpose, is insufficient to establish a constitutional violation.  Washington v. Davis, 426 U.S. 229, 239-42 (1976).  McAllister has not articulated, and the record would not support the finding of, any discriminatory purpose behind Directive # 4913.

If an individual cannot "allege membership in [a protected] class, he or she can still prevail in . . . a class of one equal protection claim."  Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005) (internal quotation marks and citations omitted).  To succeed, a plaintiff must show "that [he] were intentionally treated differently from other similarly-situated individuals without any rational basis."  Clubside, Inc. v. Valentin, 468 F.3d 144, 158-59 (2d Cir. 2006).  Additionally, a plaintiff must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves . . . ."  Neilson, 409 F.3d at 104.  For the same reasons cited above, these claims must also fail as McAllister has not established intentional treatment different from those other inmates that were similarly situated.  Furthermore, for the reasons stated above, Directive # 4913 is rationally related to a legitimate state interest, increased order, cleanliness, and safety in the prisons.

Accordingly, defendants' motion on this ground should be granted as to the third cause of action.


### F. Eleventh Amendment

McAllister sues the defendants in both their individual and official capacities.  Compl. Defendants seek summary judgment on McAllister's claims against them in their official capacities.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment.  Halderman, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states.  See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official.  Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988)(citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985). Here, McAllister seeks monetary damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCCS.  Thus, the Eleventh Amendment bar applies and serves to prohibit McAllister's claim for monetary damages against defendants in their official capacities.

Accordingly, it is recommended that defendants' motion on this ground be granted.

26

### III.  Hearing Officer Call

If the recommendations herein are adopted, judgment will be granted to the presently named defendants, leaving only the "John/Jane Doe(s)" and the only claim remaining will be McAllister's Fourteenth Amendment due process claim alleging that there existed no evidence to support the hearing officer's finding of guilt at the disciplinary hearing.  As discussed above, none of the presently named defendants were personally involved in that determination.  McAllister has requested additional time to file an amended complaint adding the hearing officer as a defendant on that claim.

Rule 4(m) of the Federal Rules of Civil Procedure provides in part:

> If a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

In this case, McAllister contends that he did not know the identity of various John and Jane Does, including the hearing officer, because he did not receive adequate discovery from defendants.  Dkt. No. 53, ¶¶ 3-5.  After viewing the facts in the light most favorable to McAllister, the only claim which survived the present motion is his Fourteenth Amendment due process claim regarding the disposition of his disciplinary hearing by Hearing Officer Call.  Accepting as true that McAllister was not aware of his identity until recently, good cause has been shown for his failure to specifically identify Call as a defendant. Accordingly, it is ordered that McAllister will have an additional sixty days to amend his complaint to add Hearing Officer Call as the defendant personally involved with the alleged due process claim.

27

## IV.  Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 49) be:

    1.  **DENIED** as to McAllister's procedural due process claim in connection with his disciplinary hearing; and

    2.  **GRANTED** as to all presently named defendants and claims other than the due process claim in connection with his disciplinary hearing; and

**IT IS FURTHER RECOMMENDED** that McAllister be granted sixty (60) days to file an amended complaint to add hearing officer Call as a defendant.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  July 6, 2012
        Albany, New York

                              *David R. Homer*
                              United States Magistrate Judge